IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEIDRE KELLOGG KETROSER,<br><br>Plaintiff,<br><br>v.<br><br>7-ELEVEN, INC., et al.,<br><br>Defendants. | Case No.  19-cv-05231-MMC<br><br>**MEMORANDUM OF DECISION;<br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

In this action, plaintiff Deidre Kellogg Ketroser ("Ketroser") sues defendants 7-Eleven, Inc. and Southland Corporation (collectively, "7-Eleven") for disability discrimination in connection with access barriers she encountered while visiting a 7-Eleven store located at 2500 San Ramon Valley Road in San Ramon, California (hereinafter, "the Store").

On November 7, 2022, the Court commenced a three-day bench trial on Ketroser's claims against 7-Eleven.  Irakli Karbelashvili and Irene Karbelashvili of AllAccess Law Group appeared on behalf of Ketroser.  Michael Orr and Julie Trotter of Call & Jensen, APC, appeared on behalf of 7-Eleven.  Thereafter, the parties made their closing arguments in writing (see Pltf.'s Br. in Supp. of Closing Arg. ("Pltf.'s Br."), Dkt. No. 134; Defs.' Closing Br. ("Defs.' Br."), Dkt. No. 137; Pltf.'s Reply Br. in Supp. of Closing Arg. ("Pltf.'s Reply"), Dkt. No. 143), and the Court, on January 17, 2023, conducted a hearing thereon.  Having considered the evidence presented and the arguments of counsel, as well as the parties' posttrial filings, the Court rules as follows.

/ /

**BACKGROUND[1]**

Ketroser has multiple sclerosis,[2] and occasionally requires a walker and cane for mobility.  (See Trial Tr. 222:24-223:5.)  Ketroser's balance and strength vary from day to day (see Trial Tr. 223:6-8), and her ability to walk up and down stairs, lift, push, and pull things, and reach items, is limited (see Trial Tr. 224:22-225:12).

Ketroser was married to David B. Ketroser (hereinafter, "Dr. Ketroser"), the original plaintiff in this case,[3] from 2014 until his death in 2019.  (See Trial Tr. 263:11-17.) Although Minnesota residents (see Trial Tr. 263:18-20), the Ketrosers, prior to Dr. Ketroser's passing, traveled on multiple occasions to the San Ramon area of California to visit Dr. Ketroser's son and grandson.[4]  (See Trial Tr. 229:2-14.)  During these trips, the Ketrosers stayed at the Hyatt House hotel in San Ramon (see Trial Tr. 229:17-230:7), which they preferred because the hotel was "sensitive to [their] disabilities" and "was just a nicer hotel than the other ones that [they] tried" (see Trial Tr. at 230:15-18).  The Hyatt House is located "kitty-corner," or "about a long block" away from the Store.  (See Trial Tr. 230:9-11.)

The Ketrosers visited the Store during two of their stays at the Hyatt House—once in December 2018 ("December 2018 Visit"), and once in February 2019 ("February 2019 Visit").  (See Trial Tr. 245:18-25; 248:2-8.)[5]  During the December 2018 Visit, the

_____

[1] This section and the following sections constitute the Court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a)(1).

[2] The Court takes judicial notice of the fact that Mavenclad, a drug Ketroser currently takes, and Tybrisi, a drug Ketroser took at the time of the events giving rise to this case (see Trial Tr. 370:13-19; 371:5-19), are prescription medications used to treat relapsing forms of multiple sclerosis, see Mavenclad, https://www.mavenclad.com/en# (last visited April 21, 2023); Tysabri, https://www.tysabri.com (last visited April 21, 2023).

[3] Dr. Ketroser required a wheelchair to ambulate.  (See Trial Tr. 260:5-15.)

[4] At some point "towards the end of [the Ketrosers'] visits" to California, Dr. Ketroser's son and grandson moved from San Ramon to Danville, California.  (See Trial Tr. 241:13-23.)

[5] Ketroser does not remember whether the February 2019 Visit occurred on February 14 or February 15.  (See Trial Tr. 389:14-25.)

United States District Court
Northern District of California

1   Ketrosers, upon entering the Store's parking lot in a rented accessible van (see Trial Tr.

2   246:16-247:2), found there was nowhere to park where Dr. Ketroser could deploy his

3   accessibility ramp (see Trial Tr. 247:2-3; 247:15-22), and "didn't even bother to go in"

4   (see Trial Tr. at 247:3-4.)  When the Ketrosers returned to the Store the following

5   February, Dr. Ketroser stayed in the car while Ketroser went inside.  (See Trial Tr.

6   249:13-250:12.)  Ketroser left after purchasing water.  (See Trial Tr. 251:4-6.)

7         Ketroser visited the Store for a third time on November 5, 2022, two days before

8   trial commenced in this case.  (See Trial Tr. 309:12-14.)  On this occasion, however,

9   Ketroser was staying at La Quinta Inn in Millbrae (see Trial Tr. 308:24-309:8),

10   approximately 33 miles from the Store.

**PROCEDURAL HISTORY**

12         Dr. Ketroser filed the instant action on August 21, 2019, alleging that, during the

13   course of the December 2018 Visit and February 2019 Visit to the Store, he encountered

14   various accessibility barriers, which barriers assertedly violated the Americans with

15   Disabilities Act of 1990 ("ADA"), the California Disabled Persons Act, the California

16   Health & Safety Code, the Unruh Civil Rights Act ("Unruh Act"), and the California Unfair

17   Competition Act.  (See Pltf.'s Compl. for Inj. Relief and Damages, Dkt. No. 1.)

18         Dr. Ketroser passed away on November 7, 2019.  (See Pltf.'s Statement Noting

19   the Death of David B. Ketroser 2, Dkt. No. 19; Mot. to Substitute Deidre Kellogg Ketroser

20   for the Late Pltf. David B. Ketroser 3, Dkt. No 20.)  Thereafter, Ketroser moved for an

21   order substituting herself as plaintiff in two of Dr. Ketroser's state law claims, namely, a

22   claim for damages under the California Disabled Persons Act ("CDPA") and a claim for

23   damages under the Unruh Civil Rights Act.  (See id. at 6:20-24.)[6]  By order filed March

24   13, 2020, the Court granted her motion.  See Ketroser v. 7-Eleven, Inc., 2020 WL

25   12655623, at *1 (N.D. Cal. Mar. 13, 2020).  In accordance with said order, Ketroser filed,

26

27         ─────────────────
          [6] As to the remaining three causes of action, Ketroser did not seek substitution,
28   those claims having sought solely injunctive relief.

3

United States District Court
Northern District of California

1   on March 22, 2020, an amended complaint reflecting such substitution.  (See Pltf.'s First

2   Am. Compl., Dkt. No. 24.)  Thereafter, the Court granted Ketroser leave to file a Second

3   Amended Complaint, see Ketroser v. 7-Eleven, Inc., 2020 WL 2065694, at *1 (N.D. Cal.

4   Apr. 29, 2020), which complaint added a federal claim for injunctive relief under the ADA

5   and a state law claim for injunctive relief under the Unruh Act, both brought on her own

6   behalf (see Pltf.'s Second Am. Compl., Dkt. No. 29).  Ketroser later filed a Third

7   Amended Complaint (see Pltf.'s Third Am. Compl., Dkt. No. 48), which complaint

8   incorporated the findings made by Ketroser's expert during a Northern District General

9   Order 56 joint inspection of the Store on July 21, 2020, and a Supplemental Third

10  Amended Complaint (see Pltf.'s Supp. Third Am. Compl. ("STAC"), Dkt. No. 77), the

11  operative pleading in this case, which complaint incorporated her expert's findings based

12  on a second joint inspection of the Store on October 14, 2021.

13      By order filed May 13, 2022, the Court granted in part and denied in part

14  7-Eleven's Motion for Summary Judgment on each cause of action asserted in the STAC.

15  (See Order Granting in Part and Den. in Part Defs.' Mot. for Summ. J, Dkt. No. 90.)  In

16  particular, as to Ketroser's claim for injunctive relief under the ADA, the Court granted the

17  motion, "except to the extent said claim [was] based on the interior path of travel," i.e.,

18  interior aisles; as to Ketroser's claim for injunctive relief under the Unruh Act, the Court

19  granted the motion, "except to the extent said claim [was] based on the [interior aisles]

20  and the exterior door"; and as to claims brought by Ketroser on behalf of her deceased

21  husband, Dr. Ketroser, namely, the claims for damages under the CDPA and Unruh Act,

22  the Court denied the motion.  (See id. at 1:22-2:1.)  Thereafter, Ketroser voluntarily

23  dismissed Dr. Ketroser's damages claims (see Stipulation and Order Continuing Pretrial

24  Conference and Related Deadlines, Dkt. No. 97), leaving for trial her remaining claims for

25  injunctive relief under the ADA and the Unruh Act.

26  / /

27  / /

28  / /

4

## Legal Standards

### A.  Title III of the Americans with Disabilities Act

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  See 42 U.S.C. § 12182(a). "To prevail on a discrimination claim under Title III, a plaintiff must show that: (1) [he/she] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of [his/her] disability." Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc., 603 F.3d 666, 670 (9th Cir. 2010).  There is no dispute that Ketroser is a disabled person, or that the Store is a public accommodation within the meaning of Title III.

The third element, denial of public accommodations on the basis of disability, is satisfied when there is a violation of applicable accessibility standards.  See Chapman v. Pier 1 Imports (U.S.), Inc., 631 F.3d 939, 945 (9th Cir. 2011).  The Title III accessibility standards are set forth in "three categories . . . the 'new construction' provisions, which apply to public accommodations constructed after January 26, 1993; the 'alteration' provisions, which apply to post-January 26, 1992, alterations to buildings that existed as of that date; and the 'readily achievable' provisions, which apply to unaltered portions of buildings constructed before January 26, 1993." See Moeller v. Taco Bell Corp., 816 F.Supp.2d 831, 847 (N.D. Cal. 2011).

"[The plaintiff] bears the burden of showing a violation of . . . the substantive standard of ADA compliance[,]" see Doran v. 7-Eleven, 524 F.3d 1034, 1048 (9th Cir. 2008), which violation "must be shown by a preponderance of the evidence[,]" see Kirola v. City & Cnty. of San Francisco, 2021 WL 1334153, at *2 (N.D. Cal. Mar. 12, 2021), aff'd in part, rev'd in part and remanded, 2023 WL 2851368 (9th Cir. Apr. 10, 2023).  Although an ADA plaintiff "is not required to provide specialized or technical knowledge through an

1    expert witness to prove a violation[,]" see Kohler v. Presidio Int'l, Inc., 782 F.3d 1064,

2    1068 (9th Cir. 2015) (internal quotation and citation omitted), "vague testimony regarding

3    accessibility barriers will not suffice to demonstrate [a] . . . violation[,]" see Kirola, 2021

4    WL 1334153, at *2.

5          **1.  Alteration Provisions**

6          The altered portion of any existing building altered after January 26, 1992, is

7    required, "to the maximum extent feasible," to be "readily accessible to and useable by"

8    individuals with disabilities.  See 42 U.S.C. § 12183(a)(2).  To meet this standard,

9    alterations must comply with the ADA Accessibility Guidelines ("ADAAG Standards"), see

10   Moeller, 816 F.Supp.2d at 847, which guidelines "lay out the technical structural

11   requirements of places of public accommodation," see Chapman, 631 F.3d at 945

12   (internal quotation and citation omitted); see also Wyatt v. Ralphs Grocery Co., 65 Fed.

13   App'x 589, 590 (9th Cir. 2003) (holding "[v]iolations of ADAAG standards indicate the

14   existence of an architectural barrier").

15         Although "[t]he original implementing regulations for the ADA adopted the 1991

16   version of the ADAAG Standards ('1991 ADA Standards'), republished at 28 C.F.R. Pt.

17   36, App. D[,] they have since been replaced by the 2010 version of the ADAAG

18   Standards ('2010 ADA Standards) codified at 36 C.F.R. 1191, App. B&D (2009)."  See

19   Lane v. Landmark Theatre Corp., 2020 WL 1976420, at *8 (N.D. Cal. Apr. 24, 2020).

20   The 2010 ADA Standards apply to alterations made on or after March 25, 2012, and the

21   1991 ADA Standards apply to alterations made before that date.[7]  See Kohler v. Flava

22   Enterprises, Inc., 779 F.3d 1016, 1019 (9th Cir. 2015); see also 28 C.F.R. § 36.406(a).

23   / /

24

25         [7] Under the ADA implementing regulations, "Alteration" is defined as "[a] change to
26   a place of public accommodation or a commercial facility that affects or could affect the
     usability of the building or facility or any part thereof . . . includ[ing], but . . . not limited to,
27   remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or
     rearrangement in structural parts or elements, and changes or rearrangement in the plan
28   configuration of the walls and full-height partitions."  See 28 C.F.R. § 36.402.

United States District Court
Northern District of California

1

### 2.  Readily Achievable Provisions

2      In existing but unaltered buildings, architectural barriers must be removed where it

3  is "readily achievable" to do so.  See 42 U.S.C. § 12182(b)(2)(A)(iv). The removal of

4  barriers is "readily achievable" when it is "easily accomplishable and able to be carried

5  out without much difficulty or expense."  See 42 U.S.C. § 12181(9).  If an entity

6  demonstrates that the removal of an architectural barrier is not readily achievable, it

7  nonetheless discriminates against persons with disabilities if it fails "to make such goods,

8  services, facilities, privileges, advantages, or accommodations available through

9  alternative methods if such methods are readily achievable."  See 42 U.S.C.

10  § 12182(b)(2)(A)(v).

11      **B.  Unruh Civil Rights Act**

12      The Unruh Act "prohibit[s] discrimination on the basis of disability in the full and

13  equal access to the services, facilities, and advantages of public accommodation" see

14  Moeller, 816 F.Supp.2d at 848, and seeks to afford disabled persons additional

15  protections and remedies not provided under federal law, see Jankey v. Song Koo Lee,

16  55 Cal.4th 1038, 1044 (2012) (noting "shortly after passage of the ADA, the [California]

17  Legislature amended the state's disability protections to strengthen California law in

18  areas where it is weaker than the ADA and to retain California law when it provides more

19  protection for individuals with disabilities than the ADA") (internal quotation, citation, and

20  alteration omitted)).

21      A plaintiff can prevail on an Unruh Act claim by proving a violation of California

22  accessibility requirements, namely, Title 24 of the California Code of Regulations, also

23  known as the California Building Code ("CBC").  See Rodriguez v. Barrita, Inc., 10

24  F.Supp.3d 1062, 1074 (N.D. Cal. 2014).  The CBC "requires that any altered portions of

25  public accommodations . . . be brought into compliance with the then-applicable

26  accessibility standards." See id. at 1087.[8]  A plaintiff can also prevail on an Unruh Act

27

28

_____

[8] Under the CBC, the definition of "Alteration" is essentially the same as that under

United States District Court
Northern District of California

1  claim by proving a violation of federal disabilities law, namely, the ADA.  See Cal. Civ.

2  Code § 51(f) (providing "[a] violation of the right of any individual under the [ADA] ...

3  constitute[s] a violation of this section").  "Where California access standards provide

4  greater accessibility than the ADA, the California standards control."  Shimozono v. May

5  Dep't Stores Co., 2002 WL 34373490, at *16 (C.D. Cal. Nov. 20, 2002).

**DISCUSSION**

7  As set forth above, Ketroser's remaining causes of action are based on two

8  barriers alleged in the STAC, namely, the Store's interior aisles, which Ketroser claims

9  were narrowed by various displays (hereinafter, the "aisle claim"), and the Store's exterior

10  door, which Ketroser claims was too heavy (hereinafter, the "door claim").

11  **A. Aisle Claim**

12  Ketroser asserts that when she entered the Store during her February 2019 Visit,

13  "she had difficulty navigating inside because the interior path was crowded with items

14  such as merchandi[s]e."  (See STAC ¶ 19.)  Ketroser contends the width of the Store's

15  aisles violates both the ADA and the Unruh Act.  (See Pltf.'s Br. 18:8; 19:14.)  The Court

16  first considers the accessibility standard applicable to the instant claim, then turns to the

17  question of liability.

18  Ketroser offered evidence to show the Store's aisles were altered between July

19  2020 and October 2021 (see Trial Tr. 141:15-19; 142:2-6; see also Pltf. Exs. 8, 9, 10, 11),

20  and argues such alteration subjects the aisles to the 2010 ADA Standards and the 2019

21  CBC (see Pltf.'s Br. at 15:17-18); see also 28 C.F.R. § 36.406(a) (providing alterations

22  made on or after March 15, 2012, shall comply with the 2010 ADA Standards); California

23  Building Code Standards Commission Information Bulletin 19-04 (reporting "January 1,

24  2020 is the statewide effective date" for the 2019 CBC).[9]  Under the 2010 ADA

25  _____

26  the ADA.  See 2019 CBC § 202.

27  [9] Because the parties have stipulated that the Store was constructed in 1984,
rendering it an "existing" facility under the ADA, the "new construction" provisions are
28  inapplicable to the instant case.

Standards, "the clear width of walking surfaces shall be 36 inches (915mm) minimum," except that "[t]he clear width shall be permitted to be reduced to 32 inches (815 mm) minimum for a length of 24 inches (610 mm) maximum provided that reduced width segments are separated by segments that are 48 inches (1220 mm) long minimum and 36 inches (915 mm) wide minimum." See 2010 ADA Standards § 403.5.1.  Under the 2019 CBC, "[t]he clear width for aisles shall be 36 inches (914 mm) minimum if serving elements on only one side, and 44 inches (1118 mm) minimum if serving elements on both sides." See 2019 CBC § 11B-403.5.1.

Ketroser further argues that, even if the Court were to find the aisles unaltered, they would be subject to the 1991 ADA Standards, to the extent compliance therewith is readily achievable, and the 1981 CBC, which was in effect at the time of the Store's construction in 1984.  (See Pltf.'s Br. at 19:16-18; 19:25-16.)  Under the 1991 ADA Standards, "[t]he minimum clear width of an accessible route shall be 36 in (915mm) except at doors[,]" see 1991 ADA Standards § 4.3.3, and under the 1981 CBC, "[a]isles that are used in areas without fixed seats shall be a minimum of 36 inches (914.4 mm) in width," see 1981 CBC § 2-3304.

In response, 7-Eleven sought to show the interior aisles were never altered, such that the 2010 ADA Standards and 2019 CBC are inapplicable.  (See Trial Tr. 192:19-193:6; 573:24-574:5.)  In its closing brief, however, 7-Eleven argues that, "regardless of what standard is applied, the aisle is compliant" because, "[w]ith the exception of his one visit, where he found the aisle temporarily impacted by a movable display, at all times [Ketroser's] expert found the aisle to be 44" wide[.]"  (See Defs.' Br. at 20:21-23.)

### 1. Ketroser has not established an aisle barrier based on her February 2019 Visit.

To the extent Ketroser seeks to establish an aisle barrier based on obstructions she personally encountered during her February 2019 Visit, the evidence offered at trial is insufficient to support such a finding, even applying the strictest accessibility standard governing aisle width, namely, the 44-inch requirement in the 2019 CBC.  In particular,

when asked at trial to provide "detail on exactly what she saw" with respect to the Store's

aisles during her February 2019 Visit, Ketroser testified:

> So there were displays.  There was a display of bread.  I
> remember that distinctly.  It was between the first and second
> aisle, but more blocking the first aisle.  And then displays
> along the glass wall; sunglasses, things like that.  The
> displays impinged on the width of the - - of the aisle."

(See Trial Tr. 250:13-20.)  Ketroser then decided to walk down the second aisle rather

than the first aisle, and did so without difficulty.  (See Trial Tr. 356:6-20.)

### a.  "Bread display"

Ketroser failed to offer evidence that the above-referenced "bread display"

narrowed the Store aisle to less than 44 inches.  In that regard, Ketroser's own testimony

contains no detail regarding the size of the bread display, including how much it may

have impinged on the width of any aisle.  When asked about the bread display on cross-

examination, Ketroser described it as "an iron display that was large that had bread on it."

(See Trial Tr. 354:22-23.)  When asked by the Court whether she could "say any more"

about the bread display, beyond her testimony that such display existed at the time of her

visit (see Trial Tr. 328:5-6), Ketroser testified:

> Well, it was a bread display that was on the end cap and part
> way into the first aisle.  It was between the first and second
> aisle, but it wasn't blocking the second aisle.  And I think I
> recalled incorrectly that it was blocking the second aisle and
> it wasn't.

(See Trial Tr. 328:7-11.)  Ketroser then engaged in the following exchange with the

Court:

> The Court: Okay: And if I've got a picture of it then . . .
> we've seen some picture of things in an aisle.  Somebody
> walking down the aisle and maybe there's something,
> whatever, display or what-have-you.  This is before you enter
> the aisle –
>
> A: Right.
>
> The Court: – that you're talking about.  And maybe it was a

little bit to one side, and you're saying you couldn't get your walker past it.

A: There was a big display that was metal, and it was very tight to get my walker through.

The Court: Okay.  You didn't try, but it looked like it would be hard.

A: Right.

(See Trial Tr. 328:12-328:24.)  Ketroser's description does not, as set forth below, suffice to establish an aisle reduced to less than 44 inches in width.

In particular, during subsequent inspections of the Store, neither Ketroser's expert, Basil Altwal,[10] nor 7-Eleven's expert, Neil Casper,[11] encountered anything resembling the bread display described by Ketroser, and, during the first joint inspection of the Store on July 21, 2020, Altwal found the aisles in compliance with all relevant accessibility standards, and, indeed, testified the aisles were "good" and that "[t]hey were clean and they had the correct width."  (See Trial Tr. 141:17-18.)  Thereafter, during an inspection of the Store on February 17, 2022, Casper "measured the entire length of the [first] aisle and found it to be varying between 47 inches and 53 inches in width."  (See Trial Tr. 584:18-20.)  Under such circumstances, even if Ketroser did encounter a bread display protruding into the first aisle during her February 2019 Visit, there is insufficient evidence that such protrusion necessarily reduced the aisle to a width of less than 44 inches.

### b.  "Displays along the glass wall"

Ketroser also failed to offer evidence that the above-referenced "displays along the glass wall" (hereinafter, "glass wall displays")[12] narrowed the Store's first aisle to less

---

[10] Altwal was retained by Ketroser's counsel for consultation.  He has a degree in architecture and is a Certified Access Specialist.  (See Trial Tr. 73:20; 74:23.)

[11] Casper was retained by 7-Eleven's counsel for consultation.  He is the founder of Casper Development Resources, which provides ADA and state access consulting and inspections.  (See Trial Tr. 556:18-20.)  Casper is also a Certified Access Specialist. (See Trial Tr. 558:3-4.)

[12] The "glass wall" is the exterior window, which constitutes part of the front of the

11

than 44 inches.  At trial, Ketroser did not elaborate as to her encounter with the glass wall display, except during the following exchange with defense counsel:

> Q: Okay.  And with respect to that first aisle, you didn't make any effort to go down it, and that's the aisle that you thought you saw some kind of sunglass display; is that correct?
>
> A: Uh-huh.
>
> Q: Yes?
>
> A: Yes, that's correct.  I didn't make an effort because I didn't think I could do it without hitting something.

(See Trial Tr. 356:17-23.)  The Court finds such testimony, without more, insufficient to establish a violation, and, as set forth below, such additional evidence is lacking.

As with the bread display, subsequent visits by both parties' experts failed to confirm the condition reported by Ketroser.  As noted above, during his July 21, 2020, inspection of the Store, Altwal found all interior aisles compliant with relevant accessibility standards.  (See Trial Tr. 141:11-18.)  Although Altwal did find, during a subsequent inspection on October 14, 2021, that a portion of the first aisle measured 32.25 inches in width for a length of 26 inches (see Trial Tr. 148:19-25; Pltf.'s Ex. 11), in violation of the 2019 CBC and 2010 ADA Standards, the display causing the violation was a "gift card stand" (see Trial Tr. 148:15), not the "sunglass display" to which Ketroser testified, and there was no showing that the two displays were similar, either in size or other attribute(s).

Although Ketroser also testified that, during a visit to the Store on November 5, 2022, two days before trial commenced in this case, she "looked down the [first] aisle and the same type of displays were there that were just impeding into the aisle" (see Trial Tr. 261:18-19), Ketroser did not elaborate as to what "type" of displays she encountered on that later visit, nor did she elaborate as to how they were "the same" as the bread and/or

building and one side of the first aisle.

United States District Court
Northern District of California

1    sunglass display she encountered during her February 2019 Visit, and, again, she offered

2    no evidence demonstrating such displays narrowed the aisles to a width of less than 44

3    inches.  Moreover, during a visit to the Store the very next day, on November 6, 2022,

4    Altwal found the first aisle "open" and that the displays along the glass wall "were not

5    protruding into the path of travel."  (See Trial Tr. 189:11-13.)  Altwal's testimony was

6    confirmed by Terrance Truax, 7-Eleven's Senior Regional Facility Manager, who also

7    visited the Store on November 6, 2022, and found the aisles compliant with the CBC's

8    44-inch requirement (see Trial Tr. 431:16-23; 535:17-21) by "look[ing] at the size of the

9    tiles in the store," which are 12 inches by 12 inches, and "determin[ing] the distance

10   between each aisle by counting the tiles" (see Trial Tr. 534:2-6).

11           In sum, the record reflects only one confirmed instance in which the positioning of

12   a display along the glass wall reduced the width of the first aisle to less than 44 inches.

13   That display, however, was observed more than two years after Ketroser's February

14   2019 Visit, it involved a different kind of display than the one Ketroser encountered during

15   her visit, and there was no evidence of similarity, such as to give rise to an inference with

16   respect to the extent of any protrusion into the aisle at the time of her visit.

17                                    c.  Experience

18           To the extent Ketroser argues her "experience" at the Store during her February

19   2019 Visit "was a sufficient basis to opine regarding measurements of possible barriers"

20   (see Pltf.'s Br. at 21:27-22:1 (citing Strong v. Valdez Fine Foods, 724 F.3d 1042 (9th Cir.

21   2013)), such argument is unpersuasive.  Although the Court recognizes Ketroser, to

22   establish a barrier, need not have taken "precise measurements" during her visit, see

23   Strong, 724 F.3d at 1045, she still "bears the burden of showing a violation of . . . the

24   substantive standard of ADA compliance," see Doran, 524 F.3d at 1048, e.g., by giving

25   testimony from which a measurement reasonably can be determined, and, as set forth

26   above, the Court finds the evidence offered at trial insufficient to meet that burden, see

27   e.g., id. (finding wheelchair-bound plaintiff's testimony that he "scraped his knuckles on

28   the edge of the aisles" while shopping, "unsupported by any measurements, [was]

insufficient to demonstrate that 7-Eleven's aisles [did] not comply with" relevant ADA standard); cf. Strong, 724 F.3d at 1045 (finding plaintiff's declaration that he "encountered parking spaces, access aisles and sidewalks with slopes exceeding 2.0%" sufficient to support ADA violation, given "his prolonged experience with ADA compliant (and non-compliant) access ramps"); Chapman v. Pier 1, 779 F.3d 1001, 1007 (9th Cir. 2015) (finding plaintiff established violation of ADA where plaintiff "encountered several obstructed and blocked aisles" on "eleven separate visits" during which he took "photographs . . . depict[ing] a number of aisles that contain[ed] merchandise or other items," including "furniture (armchairs and tables)," that "result[ed] in a functional width measurably less than [the ADA requirement]") (emphasis added).

### 2. Ketroser has not established an aisle barrier based on her expert's visit.

Ketroser argues that, irrespective of whether she personally encountered any barrier to accessibility, her aisle claim can rely exclusively on the findings her expert Altwal made during his October 2021 inspection of the Store, and, in support thereof, cites to Doran, 524 F.3d at 1034, Parr v. L&L Drive-Inn Restaurant, 96 F.Supp.2d 1065 (2000), and Brooke v. Kalthia Group Hotels, 2015 WL 7302736 (S.D. Cal. Nov. 18, 2015), all of which hold that a plaintiff, for purposes of standing to challenge an accessibility barrier, need not have personally encountered that barrier.

Those cases are, however, distinguishable, in that they stand for the proposition that a plaintiff who has expressed an intent to visit a defendant's business in the near future or within a specified timeframe, and is informed by a reliable source that it would be futile to do so based on existing barriers to accessibility, has the same standing to challenge those barriers as someone who personally went to the premises and encountered them firsthand.  See Brooke, 2015 WL 7302736, at *6 (holding "'[a]lthough plaintiffs need not engage in the "futile gesture" of visiting a building containing known barriers . . . , they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers'") (quoting Steger v. Franco, Inc.,

1    228 F.3d 889, 892-94 (8th Cir. 2000)).  Here, by contrast, there is no evidence that

2    Ketroser intended to visit the Store at or near the time of Altwal's October 2021 visit.  Nor

3    can she rely on his visit as discovering an additional barrier, in that, as discussed above,

4    she has not shown she either encountered or had reliable notice of an earlier barrier.  Cf.

5    Parr, 96 F.Supp.2d at 1081 (holding where ADA plaintiff "encounter[s] an architectural

6    barrier," such plaintiff "should not be required to encounter every barrier seriatim within

7    [defendant's business] to obtain effective relief").

8        Moreover, in each of the above cases, the court made clear that, for purposes of

9    standing to bring a claim for injunctive relief as opposed to damages, a plaintiff must

10   show, as a matter separate and distinct from a showing of initial injury, that he or she

11   intends to return to the defendant's business establishment once it is made accessible.

12   Here, even if Ketroser had shown she would have encountered a barrier absent notice

13   thereof, she has not, as set forth later herein, established a meaningful intent to return in

14   the future.

15   **B. Exterior Door**

16       Ketroser alleges that the Store's exterior door "need[ed] more than 5 lbs of

17   maximum pressure to operate" (see STAC ¶ 30), and Ketroser argues the door thus was

18   in violation of the Unruh Act.  (See Pltf.'s Br. at 22:3-5.)  The parties do not dispute that

19   the door claim is governed by § 11B-404.2.9 of the 2013 CBC, which, in relevant part,

20   provides that "the maximum effort to operate exterior doors shall not exceed five pounds."

21   See 2013 CBC § 11B-404.2.9.  7-Eleven argues that Ketroser has offered insufficient

22   evidence to show a violation of the relevant accessibility standard.  The Court again

23   agrees.

24       **1. Ketroser has not established a door barrier based on her February 2019 Visit.**

25       To the extent Ketroser seeks to establish a door barrier based on her personal

26   experience with the door during her February 2019 Visit, the evidence offered at trial is

27   insufficient to support such a finding.  At trial, Ketroser first described the entrance doors

28   as "very heavy" (see Trial Tr. 249:20-21), and later added, "I manually pulled the door[;]

United States District Court
Northern District of California

1    [i]t was very, very heavy[;] somebody helped me" (see Trial Tr. 250:5-7).[13]  Although

2    Ketroser, as might be expected, took no measurements of the door pressure during her

3    February 2019 Visit to the Store (see Trial Tr. 348:3-5), there is no evidence of any

4    measurements taken by anyone that day or shortly thereafter (see Trial Tr. 348:6-9).[14]

5    The Court finds, without more, Ketroser has not met her burden of proving the exterior

6    door exceeded the 5-pound limit set forth in the CBC, and, as described below, such

7    additional evidence is again lacking.

8         First, the evidence offered by both experts at trial shows fluctuations in operating

9    pressure are, based on a variety of factors, not only common, but, indeed, likely.  In that

10   regard, plaintiff's own expert, Altwal, testified "[door] pressure changes with time" (see

11   Trial Tr. 126:18), and the measurements taken by the parties' respective experts are

12   consistent therewith.  In particular, while Altwal, during his first inspection of the store, on

13   July 21, 2020, measured the door pressure at "around 10 pounds" (see Trial Tr.

14   106:2-7),[15] his measurements during his second inspection, on October 14, 2021, were,

15   respectively, "seven and a half pounds on the left leaf, and eight pounds on the right leaf"

16   (see Trial Tr. 119:14-120:4), whereas Casper, during his inspection on February 17,

17   2022, measured them at "4.8 and 4.9 pounds" (see Trial Tr. 593:18-20).  Moreover, all of

18   those measurements were taken in years after Ketroser's visit and only one, namely,

19   Casper's, in the same month.

20        The following testimony by Altwal further demonstrates why his measurements,

21   taken, respectively, almost a year and a half and more than two years after Ketroser's

22   ─────────────────────

23        [13] Ketroser noted that, at the time of this visit, she relied on her walker to
     ambulate.  (See Trial Tr. 249:16-20.)

24
         [14] The Court again recognizes that Ketroser, to establish a barrier, need not have
25   taken measurements during her visit, see Strong, 724 F.3d at 1045; nevertheless, she
     still "bears the burden of showing a violation of . . . the substantive standard of ADA
26   compliance[,]" see Doran, 524 F.3d at 1048, by showing a measurement was taken at or
     near the time of her visit and in similar conditions.

27
         [15] Altwal did not specify whether this measurement applied to one leaf or both
28   leaves.

United States District Court
Northern District of California

visit and at a different time of year, are not reliable support for Ketroser's claim:

> Q: But even if I go out and I tweak the doors to be at five pounds, I can go out tomorrow and they could be at ten or seven pounds; correct?
>
> A: It could be. [16]

(See Trial Tr. 171:13-16.)

Casper's testimony is in accord.  When asked whether, "[i]n [his] experience, is it possible for a door pressure reading on one day to change the very next day based upon . . . external forces," Casper answered, "[y]es."  (See Trial Tr. 591:15-18.)  Casper also engaged in the following exchange with defense counsel:

> Q: Do you agree with Mr. Altwal that there are numerous external factors that could impact the results of a pressure reading on a door?
>
> A: Definitely.
>
> Q: What types of things?
>
> A: The most common one is wind.  It can be really difficult to get readings based upon the wind of the day.  Temperature affects it.   The pressure of the building's HVAC, the mechanical system, air conditioning, heating affect it.
>
> Q: Could the operator of the instrument doing the pressure test cause odd readings?
>
> A: Yes.  You have to—there's two things primarily that affect it.  The most common one is someone pushes really hard initially, which causes a spike in the gauge and isn't really reading the actual door force.  It's requiring the extra force that they applied.  And the other is not keeping the gauge perpendicular to the door as it pivots."

(See Trial Tr. 589:22-590:14.)

Under all of the above circumstances, the Court finds that, given Ketroser's having

---

[16] Altwal testified that he advises his clients to check door pressure "every six months" due to changes in pressure over time.  (See Trial Tr. 126:16-18.)

United States District Court
Northern District of California

1    attempted to pull the door open on a rainy, windy day,[17] while holding onto her walker for

2    stability, what Ketroser felt as heaviness did not necessarily amount to a violation of the

3    five-pound limit set forth in the CBC.

### 2. Ketroser has not established a door barrier based on her expert's visits.

To the extent Ketroser argues that, even if she has not shown the door pressure

exceeded five pounds on the date of her visit, she can base her door claim solely on the

measurements Altwal took on his visits in later years, such argument is, for the reasons

stated above with respect to the aisle claim, unpersuasive.  In particular, Ketroser has not

offered sufficient evidence to show she had any intent to visit the Store at or near the

time of Altwal's July 2020 or October 2021 visits, and, in any event, as set forth below

with respect to the element of intent to return, she lacks standing to bring a claim for

injunctive relief.[18]

### C. Standing: Intent to Return

Even if Ketroser had shown she personally encountered a barrier to accessibility,

or, in the alternative, had shown the legal equivalent by receiving notice thereof, her

claims fail for lack of standing, namely, a failure to establish her entitlement to injunctive

relief.

The "irreducible constitutional minimum of standing" requires a plaintiff not only to

---

[17] At defendant's request, the Court took judicial notice of the weather in San Ramon at the time of Ketroser's February 2019 Visit.  (See Trial Tr. 410:6-411:9.)  In particular, given, as noted, Ketroser's uncertainty as to whether her February 2019 Visit was on the 14th or 15th of the month, the Court took judicial notice that, on February 14, 2019, "[t]otal precipitation for the day was 1.43 inches with mean wind speed of 12.31 mph, maximum sustained wind speed of 25.32 mph and maximum wind gusts of 33.2 mph[,]" and on February 15, 2019, "[t]otal precipitation for the day was .68 inches with mean wind speed of 10.24 mph, maximum sustained wind speed was 25.32 mph, and maximum wind gusts were 33.26 mph."  (See Defs.' Req. for Judicial Notice 2, Dkt. No. 125.)

[18] In light of this finding, the Court has not addressed herein 7-Eleven's additional argument that Ketroser's door pressure claim fails on grounds of mootness, a subject which, as discussed at the hearing on the parties' closing arguments, would require the Court's construction of ambiguous language in the California Building Code.

United States District Court
Northern District of California

have suffered an injury in fact, see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), but, where, as here, a plaintiff seeks injunctive relief, such plaintiff must also demonstrate "a sufficient likelihood that [he/she] will be wronged again in a similar way[,]" see Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1081 (9th Cir. 2004) (internal quotation and citation omitted).

Although Ketroser, when asked whether she "intend[s] to return to this 7-Eleven store in the future[,]" responded, "[w]ell, I would like to[;] I find it very convenient, and I would stay at the Hyatt House at the next visit, and it's the closest store" (see Trial Tr. 262:20-24), the Court, having considered all the evidence introduced at the trial, concludes that, at least as of the time at which her claims in the instant action were filed, she has never held more than that generalized wish, see, e.g., Loskot v. Super Star, LLC, 2007 WL 1703645, at *2 (N.D. Cal. June 12, 2007) (finding, in context of ADA's standing requirement for injunctive relief, "a mere profession of intent to return 'someday' is 'simply not enough' to confer standing") (quoting Lujan, 504 U.S. at 561).

At the outset, the Court notes that Ketroser currently resides in Minneapolis, Minnesota (see Trial Tr. 220:1-2), a distance of more than 2,000 miles from the Store. Although the Court agrees with Ketroser that even a substantial geographical distance is not a legal bar to establishing standing, it is, as a factual matter, of particular importance. Here, as set forth below, Ketroser's asserted purpose for visiting the San Ramon area in the past, namely, "[t]o visit [Dr. Ketroser's] son and grandson" and "to work with an author in the San Francisco area that [Ketroser] was working with" (see Trial Tr. 229:14-16), does not provide an adequate basis from which to infer she will make the 2,000-mile trip from Minneapolis in the future, see Lujan 504 U.S. at 561 (holding "each element [of standing] must be supported in the same way as any other matter on which [the] plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").

To the extent Ketroser relies on evidence showing a history of visiting the San Ramon area with her husband to "visit [Dr. Ketroser's] son and grandson" (see Trial Tr.

United States District Court
Northern District of California

19

229:14),[19] the Court notes that Dr. Ketroser has since passed away, which raises a question as to whether Ketroser will continue to travel to the San Ramon area for such purpose without him, and the Court concludes Ketroser has not introduced evidence sufficiently convincing to support such a finding.  First, there is no evidence from which one can deduce a close relationship between Ketroser and her stepson or her stepson's family.  Indeed, even when Dr. Ketroser was alive, the Ketrosers never stayed with or even visited with Dr. Ketroser's family at his son's home, either in San Ramon or, more recently, in Danville, because neither home was accessible to either of them.  (See Trial Tr. 229:17-230:1.)   Further, since the time of Dr. Ketroser's passing, Ketroser has seen Dr. Ketroser's son and grandson in person on only two occasions: once, in Minneapolis, at Dr. Ketroser's funeral in November 2019 (see Trial Tr. 243:1-5), and once while Ketroser was in California for the trial of the instant case (see Trial Tr. 242:19-25).  Although when asked if she has "any future plans to meet with [Dr. Ketroser's] grandson," Ketroser testified: "[y]es; [o]n his birthday or around his birthday, which is in May[;] [p]robably April is when I'd come" (see Trial Tr. 243:18-24), Ketroser does not know how old her step-grandson is (see Trial Tr. 384:6-10), and offered no evidence of confirmed travel plans at or around the time of his birthday (see Trial Tr. 380:25-381:7).  Moreover, as reflected in the Hyatt House invoices, the Ketrosers, even prior to Dr. Ketroser's passing, visited the San Ramon area only one time in the month of May, approximately six years ago (see Trial Tr. 380:14-22), and not at all in the month of April (see Pltf.'s Exs. 26, 27, 28), demonstrating, as defendants point out, "a birthday visit is not something that [Ketroser] appears to have done on any regular basis" (see Defs.' Br. at 10:7-8).

Next, to the extent Ketroser relies on evidence showing a history of visiting the San Ramon area to "work with an author" (see Trial Tr. 229:15), the Court is again

---

[19] Ketroser introduced invoices from her stays at the Hyatt House in San Ramon, which show the following arrival and departure dates: December 16-20, 2016; May 3-8, 2017; August 25-September 3, 2018; December 12-16, 2018; February 13-17, 2019; and March 13-17, 2019.  (See Pltf.'s Ex. 26.)

1    unconvinced.  When asked whether she "ever meet[s] with anyone else in the San

2    Ramon area besides [Dr. Ketroser's] family members[,]" Ketroser testified she is helping

3    an author named Frederick Stasek "file a complaint against the medical board for some

4    injury caused to his son years ago," and "rewrite his book . . . in an editor capacity" (see

5    Trial Tr. 244:2-25), but she also testified Stasek lives "a ways" from San Ramon (see

6    Trial Tr. 365:6-8) and that she has met with him in person "at the Hyatt House in San

7    Ramon" on only two occasions (see Trial Tr. 244:14-18), whereas she meets with him

8    online "all the time" (see Trial Tr. 244:8-18).  When asked about the "benefit" of in-person

9    meetings, she testified: "I think it's just the relational aspect" (see Trial Tr. 245:7-10), and

10   later acknowledged she had no plans to meet with him during the time she was in

11   California for the trial (see Trial Tr. 365:3-5).  Under such circumstances, the Court is not

12   persuaded Ketroser will return to the San Ramon area for the purpose of collaborating

13   with Stasek.

14        Additionally, and of considerable significance, it is undisputed that Ketroser

15   harbors ongoing concerns about the risks of contracting Covid-19 during travel.  Ketroser

16   testified she "[has] been afraid to travel, and it made [her] nervous to come" to California

17   for the trial in this case because she is immunocompromised and "seem[s] to get

18   [COVID] easily."  (See Trial Tr. 243:11-13; see also Trial Tr. 381:13-382:5.)  Ketroser also

19   testified that, prior to the trial, she had not traveled outside of Minneapolis during the

20   Covid 19 pandemic, with the exception of a retreat within Minnesota, to which she drove.

21   (See Trial Tr. 243:14-17.)  The Court finds such concerns, coupled with the typical

22   challenges associated with air travel, especially for disabled persons requiring the

23   assistance a walker or cane to ambulate, make Ketroser's future trips to the San Ramon

24   even less likely.

25        Even if Ketroser had offered evidence at trial sufficient to establish her intent to

26   return to the San Ramon area, however, she has not made a showing that she will return

27   to the Store.

28        First, Ketroser does not appear to have strong ties to the 7-Eleven brand.

1   Although, when asked whether there are "certain goods available at 7-Eleven stores . . .

2   that you can't necessarily purchase at another convenience store or grocery store,"

3   Ketroser answered, "[s]lushies," she did not purchase a slushy on either visit.  (See Trial

4   Tr. 362:9-11.)  Moreover, there are no 7-Eleven locations in her home state of Minnesota

5   (see Trial Tr. 362:17-25), and Ketroser has never visited any other 7-Eleven location in

6   California (see Trial Tr. 285:7-11).

7        Second, Ketroser's testimony at trial demonstrated that the products offered at

8   7-Eleven do not differ in any meaningful way from those available for sale at the Hyatt

9   House.  Ketroser testified that the Hyatt House grocery-convenience store sold "water

10  and candy" (see Trial Tr. 287:4), as well as "frozen food" (see Trial Tr. 287:8) and "chips"

11  (see Trial Tr. 287:11-12).  Although, on direct examination, Ketroser asserted the

12  purpose of her December 2018 and February 2019 visits to the Store was to obtain

13  snacks (see Trial Tr. 246:3-6; 248:17-20), including snacks not sold at the Hyatt House,

14  namely, pretzels (see Trial Tr. 248:23-249:1; 286:25-287:4), she later testified on cross-

15  examination that she "just do[esn't] remember pretzels one way or another" (see Trial Tr.

16  287:13-15).

17       Lastly, although Ketroser testified the Store was the "closest store" to the Hyatt

18  House hotel (see Trial Tr. 246:7), Ketroser has made only three visits to the Store, two of

19  which were at the behest of Dr. Ketroser (see Trial Tr. 376:23-377:4) and one of which

20  took place two days before the trial, cf., e.g., Doran, 524 F.3d at 1040 (finding Northern

21  California plaintiff had standing under ADA where he had visited defendant's store ten to

22  twenty times previously and intended to go to the area during annual trips to Disneyland);

23  Pickern v. Holiday Quality Foods Inc., 293 F.3d 1133, 1135 (9th Cir. 2002) (holding

24  plaintiff had standing under ADA where he averred store in question, although located

25  seventy miles from his home, was his favorite grocery store and that he visited the area

26  every week to see his grandmother).

27  / /

28  / /

22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons stated, the Court finds plaintiff Deirdre Kellogg Ketroser has failed to prove her claims by a preponderance of the evidence, and accordingly, the Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

Dated: April 25, 2023

MAXINE M. CHESNEY
United States District Judge